## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

CORY A. RICKS; DOROTHY J. RICKS;  )
GREGORY C. RICKS; JERI RICKS  )
SWEENEY; JOSEPH PAUL BARONE;  )
DOROTHY DUNWOODY BARONE;  )
PERRY J. WIGGINS; DARLENE R.  )
WIGGINS; CHARLES V. LIPTHRATT;  )
PHILLIP H. FLOURNOY; KATHY  )
FLOURNOY; LANDON E. WILCHAR;  )
RUBY COPELAND DUKES; RALPH V.  )
JACKSON; BETTY W. JACKSON;  )
ROY L. SCARBOROUGH; JOAN  )
P. SCARBOROUGH; COLAN B.  )     CIVIL ACTION FILE
STRICKLAND; COLEL LOLLIE  )     NO. ___CV205-172
STRICKLAND; VIRGINIA H.  )
STRICKLAND; JOHN F. DEJOURNETT;  )
DORIS DEJOURNETT; HARRY LEROY  )
HERRING; and MARY ANN HERRING,  )
  )
        Plaintiffs,  )
  )
HONEYWELL INTERNATIONAL,  )
INC., formerly known as  )
ALLIED CHEMICAL CORPORATION  )
and as ALLIEDSIGNAL, INC.,  )
  )
        Defendant.  )

## COMPLAINT
(Morrison Slough)

COME NOW Plaintiffs through counsel and show the Court the following:

### JURISDICTION AND VENUE

1.

The Plaintiffs are residents and citizens of the State of Georgia.

2.

The Defendant Honeywell International, Inc. is a corporation incorporated under the laws of

the State of Delaware. Its principal place of business is 101 Columbia Road, Morristown, New

Jersey. This Defendant may be served by service upon its registered agent for service, C. T. Corp. Systems, 1201 Peachtree Street, N.E., Atlanta, Georgia 30361. It is subject to the jurisdiction of this Court. This corporation was formerly named AlliedSignal, Inc. and, before being named AlliedSignal, Inc. was called Allied Chemical Corporation. This company is referred to herein as "Allied."

3.

This action arises from the conduct of Defendant Allied in dumping tens of thousands of pounds of mercury and poly-chlorinated byphenols (PCBs) into the Turtle River, tributaries flowing from the Turtle River, including Purvis Creek, Gibson Creek, Yellow Bluff Creek, Morrison Slough and the surrounding marshlands into the Turtle River estuary in Glynn County, Georgia. Defendant Allied's mercury and PCBs have trespassed upon the property of the Plaintiffs and created a nuisance that has damaged and continues to damage the property owned by the Plaintiffs.

4.

The amount in controversy as to each Plaintiff exceeds the sum of $75,000.00, exclusive of interest and costs. There is complete diversity of citizenship.

5.

Jurisdiction is founded upon 28 U.S.C. § 1332. Venue lies in the United States District Court for the Southern District of Georgia pursuant to 18 U.S.C. § 1391(a)(2).

**GENERAL ALLEGATIONS**

6.

The Plaintiffs own the following property identified by the tax map, parcel number and address:

| **NAME** | **TAX MAP, PARCEL NUMBER** | **PROPERTY ADDRESS** |
|---|---|---|
| Cory A. Ricks | 0096-10 000-006 | Blythe Beach Drive |
| Dorothy Dunwoody Barone<br>Joseph Paul Barone | 0096-10 000-008 | 216 Blythe Beach Drive |
| Charles V. Lipthratt | 0096-10 000-011 | 150 Blythe Beach Drive |
| Charles V. Lipthratt | 0096-10 000-117 | 142 Blythe Beach Drive |
| Landon E. Wilchar | 0096-10 000-013 | 180 Wiggins Road |
| Landon E. Wilchar | 0096-10 000-021 | 0 Wiggins Road |
| Landon E. Wilchar | 0096-10 000-022 | 135 Potlikker's Place |
| Landon E. Wilchar | 0096-10 000-023 | 136 Potlikker's Place |
| Ruby Copeland<br>Dukes | 0096-10 000-014 | 148 Wiggins Road |
| Betty W. Jackson | 0096-10 000-016 | 140 Wiggins Road |
| Betty W. Jackson<br>Ralph V. Jackson | 0096-10 000-017 | 128 Wiggins Road |
| Betty W. Jackson<br>Ralph V. Jackson | 0096-10 000-019 | 120 Wiggins Road |
| Roy L. Scarborough<br>Joan P. Scarborough | 0096-10 000-025 | 125 Burney Road |
| Phillip H. Flournoy<br>Kathy Flournoy | 0096-10 000-080 | 136 Blythe Beach Drive |
| Jeri Ricks Sweeney | 0096-10 000-121 | Blythe Beach Drive (Lot 4) |
| Dorothy J. Ricks | 0096-10 000-122 | Blythe Island Drive (Lot 2) |
| Gregory C. Ricks | 0096-10 000-123 | 220 Blythe Beach Dr. (Lot 1) |
| Colan B. Strickland<br>Colel Lollie Strickland | 0096-20 000-001 | 127 Burney Road |
| Virginia H. Strickland | 0096-20 000-002 | 135 Burney Road |

| Perry J. Wiggins<br>Darlene R. Wiggins | 0096-10 000-062 | 154 Blythe Beach Drive |
| Perry J. Wiggins<br>Darlene R. Wiggins | 0096-20 000 003 | 145 Burney Road |
| John F. Dejournett<br>Doris Dejournett | 0096-20 000-004 | 153 Burney Road |
| Harry Leroy Herring<br>Mary Ann Herring | 0096-40 001-005 | 0 Cut-off Road |

7.

The properties of the Plaintiffs abut Morrison Slough and/or interceding marsh. The Plaintiffs own all of the area on abutting rivers and creeks at and above the mean high tide line, and in addition, have property rights in the foreshore and bottoms of non-navigable tidal areas by deed and by grant of the State of Georgia.

8.

In 1955, Defendant Allied, then operating as Allied Chemical Corporation, purchased the land abutting Purvis Creek for use as a site for construction and operation of a chlor-alkalai chemical plant. The tract of land purchased by the Defendant included 480 acres of marshland. The property purchased by the Defendant in 1955 is referred to herein as the Allied Plant Site and as the Plant Site. Subsequent documents refer to this same tract of land as the "LCP Site."

9.

Defendant Allied built and operated a chlor-alkalai plant ("Plant") on the Plant Site and manufactured chlorine and caustic soda at the Plant from 1956 through December 1979, when it sold the Plant to Linden Chemicals and Plastics Corp., herein referred to as "LCP." LCP subsequently changed its corporate name to Hanlin GP, Inc., but continued to do business at the site under the trade name LCP until the Plant was closed in 1994.

-4-

10.

At the Plant, the Defendant Allied manufactured chlorine gas, caustic soda, bleach and hydrogen gas in a process using metallic mercury in large processing areas called cell rooms.

11.

By design, waste and waste water contaminated with mercury were discharged through a ditch that emptied into Purvis Creek. The mercury dumped through this ditch into Purvis Creek spread in the tidal water throughout the Turtle River estuary.

12.

Between 1956 and 1979, Defendant Allied discharged over 100 tons of vaporized mercury into the air.

13.

Mercury discharged into the air by the Defendant Allied precipitated onto the land, marshes and waters of Glynn County.

14.

Between 1962 and 1972, Defendant Allied used graphite anodes impregnated with Aroclor 1268 poly-chlorinated byphenals (PCBs) in its chlorine manufacturing process. PCBs were banned for use in the United States by the Environmental Protection Agency in the 1970's.

15.

Each PCB-impregnated anode contained from 8.5 to 10 pounds of Aroclor-1268 (PCBs). Between 1962 and 1972, Defendant Allied utilized at its Brunswick Plant approximately twenty-five percent of the amount of Aroclor-1268 (PCBs) produced annually in the United States.

16.

Between 1962 and 1972, Defendant Allied consumed thirty to sixty tons of Aroclor-1268

-5-

(PCBs) per year at the Plant.

17.

Defendant Allied was the only company in Georgia to purchase Aroclor-1268 (PCBs) for use in its manufacturing process.

18.

During the manufacturing process, mercury was absorbed by the graphite anodes.

19.

During the manufacturing process, the anodes eroded. The eroded graphite that was contaminated with mercury and Aroclor-1268 (PCBs) was discharged into Purvis Creek or captured in filters and backwashed through the plant sewer into Purvis Creek or dumped on site.

20.

An anode was considered "spent" or no longer usable after seventy to eighty percent of the anode had eroded into the cell. Defendant Allied stacked contaminated spent anodes around the Plant Site, dumped spent anodes in the marsh, built berms in the marsh out of spent anodes, and filled in potholes in roads at the Plant Site with spent anodes.

21.

The anodes that were dumped in the marsh and used to build berms contained Aroclor-1268 (PCBs) and mercury.

22.

Defendant Allied dumped tons of Aroclor-1268 (PCBs) in filter backwash sent to Purvis Creek, in the trash dump in and near the marsh behind the cell rooms, and in berms and in other construction and fill at the Plant Site.

23.

Between 1956 and 1978, Defendant Allied dumped used cell room parts in the marsh and on land to the west of the Plant. These used parts were contaminated with mercury. Mercury was visible on the ground in the areas where the old parts were dumped in the marsh.

24.

Defendant Allied used a bulldozer to fill portions of the marsh where it had dumped used parts and spent anodes containing mercury and Aroclor-1268 (PCBs).

25.

In 1973, Defendant Allied discovered that its cell rooms were sinking because caustic soda that it had dumped was chemically dissolving the earth under the Plant. The sinking foundation caused the cell room floors to crack and sink, thus facilitating further loss of mercury.

26.

No later than 1969, management of Defendant Allied knew that metallic mercury dumped into a salt water estuary would methylize into the food chain, bioaccumulate and biomagnify, with the result that fish in the estuary would acquire levels of methylmercury toxic to people who ate the fish.

27.

No later than 1969, management of Defendant Allied knew that people living near Minamata Bay in Japan had been poisoned by methylmercury in fish they had eaten, and that the source of this toxic mercury was a chemical plant that had dumped metallic mercury into Minamata Bay.

28.

Copies of studies documenting the methylization and bioaccumulation of mercury and the Minamata Bay tragedy were furnished to the management of Defendant Allied's Brunswick Plant

and kept in the Plant files. At least since 1969, management of Defendant Allied knew that metallic mercury dumped into the Turtle River Estuary would methylize, bioaccumulate in the fish and poison people who ate the fish.

29.

Despite the notice and knowledge of the toxic consequences of dumping metallic mercury into the Turtle River salt water estuary, Defendant Allied intentionally continued to dump more metallic mercury into the Turtle River Estuary and made no effort to recover the mercury that it had already wrongfully dumped and released.

30.

No later than 1970, management of Defendant Allied knew that PCBs released into the environment are strongly absorbed on particles, concentrate in animal fat, and are transferred through the food chain.

31.

No later than 1970, management of Defendant Allied knew that PCBs in very low concentrations cause death in fish, crab and oyster populations, with toxic effects found at levels as low as one part per billion in an aquatic environment, the equivalent of one pint of PCBs dumped into 300 acres of water one foot deep.

32.

No later than 1970, management of Defendant Allied knew that PCBs should never be disposed of in a manner in which the PCBs could enter an aquatic environment.

33.

Despite actual notice and knowledge of the severe toxic consequences of releasing PCBs into an aquatic environment, Defendant Allied intentionally continued to dump PCB waste at a rate of

thousands of pounds of PCBs each year onto its Brunswick Plant Site, into ponds on the Site, into marshlands and into its outfall canal that led to Purvis Creek and the Turtle River Estuary.

34.

Despite actual notice and knowledge of the severe toxic consequences of releasing PCBs into an aquatic environment, Defendant Allied took no action to remove any of the tens of thousands of pounds of PCBs that it had already dumped on its Site, into the marshlands and in the outfall canal that leads to Purvis Creek and the Turtle River Estuary.

35.

No later than 1971, management of Defendant Allied learned that its mercury had, in fact, methylized, entered the food chain and was in fish and crabs in the Turtle River Estuary at levels that posed a risk of injury to people eating the fish.

36.

Despite the knowledge and notice to Defendant Allied of the dire potential consequences of its wrongdoing, Defendant Allied elected to hide its wrongdoing and to take no action to notify and warn its neighbors, or the citizens of Glynn County or those who fished and crabbed in the Turtle River Estuary or those who ate fish and crabs from the Turtle River Estuary.

37.

In 1978, management of Defendant Allied directed managers of each Allied unit to evaluate the cost of complying with environmental laws for each unit. Management of Allied had decided to discontinue ownership and operation of plants where the cost of environmental stewardship was found to be "uneconomical."

38.

In December, 1979, Defendant Allied sold its Brunswick chlor-alkalai plant to Linden

-9-

Chemicals and Plastics Corporation (LCP) for the purpose of shedding Defendant Allied's responsibilities for environmental stewardship.

39.

Defendant Allied sold its Brunswick Plant and Plant Site to LCP without disclosing to LCP that Defendant Allied had dumped many tons of mercury and PCBs on and off the Site, and that the Plant buildings were slowly sinking because of caustic soda and mercury that Defendant Allied had dumped under the buildings.

40.

Defendant Allied sold the Brunswick Plant and Plant Site for the purpose of continuing the nuisance and trespasses that it had created by dumping mercury and PCBs that were spreading into the Turtle River Estuary and onto the Plaintiffs' property.

41.

Defendant Allied's sale of the Brunswick Plant and Plant Site had the effect of continuing the nuisance and trespasses that it had created by dumping mercury and PCBs that were spreading into the Turtle River Estuary and onto the Plaintiffs' property.

42.

Defendant Allied financed, in part, the sale of its Brunswick Plant and Plant Site to LCP and was, at all times relevant, a creditor of LCP.

43.

Defendant Allied used the power that it held as a creditor of LCP as a tool to keep the Plant in operation for the express purpose of avoiding and delaying removal of the tons of mercury and tons of PCBs that it had dumped on the Plant Site, in adjacent marshes, in the Turtle River Estuary and onto the property of others, and it thereby maintained and aggravated the nuisance and trespasses

-10-

that it had created.

44.

In 1981, Defendant Allied filed a required report with the U.S. Environmental Protection Agency that stated 4500 tons of material containing trace amounts of mercury had been disposed at the Plant Site. Defendant Allied did not inform the U.S. Environmental Agency that it had disposed of tons of PCBs on-site, that it had created an uncontained dump site containing PCBs and mercury in the marsh, or that it had discharged many tons of mercury into Purvis Creek. Defendant Allied represented in documents submitted to the U.S. Environmental Agency before 1981, in 1981, and after 1981, that the wastes that it had dumped at its Brunswick Plant Site did not contain PCBs.

45.

The false representations contained in reports that Defendant Allied filed with the government were done with the purpose and with the effect of continuing the nuisance and trespasses that Defendant Allied had created.

46.

By 1985, LCP was in financial difficulty. From 1985 to 1994, Defendant Allied used its power as a creditor of LCP to keep the Plant in operation for the purpose and with the effect of continuing the nuisance and trespasses that Defendant Allied had created.

47.

In 1988, LCP contacted Defendant Allied to complain about sinking of the mercury cell rooms and other environmental misdeeds that Allied had not disclosed to LCP prior to the sale of the Plant to LCP.

48.

In 1988, Defendant Allied formed a conspiracy with LCP to hide environmental misdeeds,

-11-

and to facilitate the continued operation of the Plant for the purpose and with the effect of continuing and aggravating the nuisance that Defendant Allied had created.

49.

When management of Defendant Allied learned that the State of Georgia had discovered some of the tons of PCBs that Defendant Allied had illegally dumped at the Plant Site, Defendant Allied conspired with LCP to assist Defendant Allied's effort to illegally hide its responsibility for the PCBs dumped at the Site by requesting that insolvent LCP claim responsibility for the PCBs, with Defendant Allied secretly reimbursing LCP for costs. Defendant Allied thus sought to pay LCP to deceive government agents for the purpose of hiding illegal, criminal conduct on the part of Defendant Allied.

50.

In 1991, the Georgia Department of Natural Resources ("the DNR") discovered that fish and other marine life in the Turtle River estuary were contaminated with mercury and Aroclor-1268 (PCBs).

51.

Following the discovery of contaminated fish, the DNR closed Purvis Creek and a portion of the Turtle River and Gibson Creek to commercial fishing and shellfish/seafood harvesting because of the presence of mercury and Aroclor-1268 (PCBs) in marine life in those waters.

52.

The DNR issued a seafood consumption advisory for these waters. The DNR advisory recommended that seafood caught in these waters not be consumed because of the presence of mercury and Aroclor-1268 (PCBs) in the marine life.

-12-

53.

In 1992, the Environmental Protection Division of the Georgia Department of Natural Resources ("EPD") learned that anodes containing Aroclor-1268 (PCBs) had been used to build berms for the Plant outfall. EPD ordered LCP to begin removal of the anodes.

54.

Defendant Allied's efforts to hide this portion of its wrongful conduct failed. The Georgia EPD learned that Defendant Allied, and not LCP, had used the PCBs and had dumped the anodes contaminated with Aroclor-1268 (PCBs) in the marsh and water. EPD ordered Defendant Allied to remove the contaminated anodes.

55.

As a result of a negotiated consent order with EPD, Defendant Allied agreed to do further testing to delineate the extent of Aroclor-1268 (PCBs) contamination at the Plant Site. As a result, EPD did not discover at this time the Aroclor-1268 (PCBs) contamination that existed in the old Allied trash dump and elsewhere at the Plant Site. Defendant Allied was thus able to continue to wrongfully hide large amounts of the PCBs that it had dumped and left in Brunswick.

56.

By 1993, Defendant Allied determined that it could save over $20,000,000 if it could keep the Brunswick Plant in operation so that it could "defer" environmental remediation costs and thus leave its mercury and PCBs on and offsite the Site, thereby continuing and expanding the ongoing nuisance and trespasses. Defendant Allied believed that if the Brunswick Plant closed, the environmental regulators would move quickly to make Defendant Allied remediate the contamination at the Plant Site.

57.

Defendant Allied attempted to keep the Brunswick Plant in operation despite LCP's financial difficulty. Defendant Allied and HoltraChem, Inc. began negotiating a prospective purchase of the Brunswick Plant and the other chlor-alkalai plants from LCP. Defendant Allied wanted to purchase the Brunswick Plant to further delay environmental remediation costs and save millions of dollars.

58.

In June 1993, EPD notified LCP of its intent to revoke the environmental permits at the Brunswick Plant.

59.

In 1993, Defendant Allied provided millions of dollars to LCP to keep the Plant in operation so that Defendant Allied could continue to postpone environmental remediation of the Plant Site, with the effect of continuing and expanding the nuisance that Defendant Allied had created.

60.

During 1993, Defendant Allied's expenditures to keep the Brunswick Plant in operation included guarantee of the Plant power bill, without which the Plant power would have been cut off and the plant would have been shut down.

61.

In October 1993, Defendant Allied took control of operations at the Brunswick Plant and sent its employee, Mark White, to serve as plant manager of the Brunswick Plant.

62.

Between September 1993, and February 1994, Defendant Allied opposed Georgia EPD's attempt to revoke LCP's environmental permits. Defendant Allied claimed that it possessed sufficient interest in the Brunswick Plant during this time to give it standing to oppose the permit

-14-

revocation proceedings.

63.

In October 1993, Defendant Allied sent James Kavney, an Allied employee, to take charge of maintenance at the Plant.

64.

Between October 1993, and February 1994, numerous Allied employees worked in operations and maintenance at the Plant.

65.

The prolonged operation of the Plant made possible by the efforts of Defendant Allied caused additional releases of mercury and PCBs from the Plant Site to the marsh and surrounding waters.

66.

Defendant Allied kept the Plant in operation in order to avoid having to spend money to remediate its releases of mercury and PCBs, and thus continued and aggravated the ongoing nuisance and trespasses.

67.

In February 1994, the Brunswick Plant shut down.

68.

A Unilateral Administrative Order was issued to Defendant Allied, LCP, and Mark White ordering them to remove the chemicals remaining at the Plant, to determine the extent of contamination at the Plant, and to begin the environmental remediation of the Plant and the Plant Site.

69.

Following the shutdown, the U.S. E.P.A. discovered tons of mercury underneath the cell

rooms, in the soil around the Plant Site, in the marsh in front of the old Allied trash dump, in the old

Allied trash dump and in the waters surrounding the Plant Site. Testing of marine life in waters

adjacent to the Plant again confirmed that the fish and crabs in this area were contaminated with

mercury and were not safe to eat. The sediment in creeks and rivers adjacent to the Plant was found

to be contaminated with mercury.

70.

The U.S. E.P.A. discovered tons of Aroclor-1268 (PCBs) in the soil around the Plant, in the

marsh in front of the old Allied trash dump, in the old Allied trash dump and in the waters

surrounding the Plant Site. Testing of marine life in waters adjacent to the Plant confirmed that the

fish and crabs in this area were contaminated with Aroclor-1268 (PCBs) and therefore were not safe

to eat. The sediment in creeks and rivers adjacent to the Plant was found to be contaminated with

Aroclor-1268 (PCBs).

71.

The U.S. E.P.A. concluded that large amounts of mercury and Aroclor-1268 (PCBs)

continued to be discharged from the Plant Site into the adjacent waters. In 1998, U.S. E.P.A.

required Defendant Allied to remove one foot of soil from thirteen acres of the marsh and sediment

in creeks in front of the old Allied trash dump. Large amounts of mercury and PCBs had continued

to be discharged from the thirteen acres of marsh and creek.

72.

Mercury and PCBs released from the Plant and the Plant Site have entered the food chain in

the Turtle River estuary and the waters and marshes adjacent to and/or abutting Plaintiffs' properties.

73.

Mercury and PCB contamination of the food chain in the Turtle River Estuary and adjacent

-16-

waters and marshes will continue indefinitely.

74.

Mercury and PCB contamination of the water, sediment, and marine life in the Turtle River Estuary and adjacent waters and marshes has interfered with and will continue to damage the Plaintiffs' property values and interfere with Plaintiffs' use and enjoyment of their waterfront and marshfront properties until contaminants are removed from the land, marsh, waters, creek and river bottoms, and marine life.

75.

The Defendant's contamination of the Turtle River, tributaries, and marshland has resulted in fishing bans and seafood/shellfish consumption bans and limitations.

76.

Plaintiffs own waterfront properties. As waterfront property owners, Plaintiffs have special rights and privileges to use and enjoy the creeks and rivers abutting their properties not shared with the general public. Plaintiffs have the right to construct docks into the creeks and rivers, and to fish and crab from the docks and from their property without the necessity of a license. Plaintiffs' waterfront properties allow them to swim, fish, crab and boat from their properties. Waterfront property can be used to access public waters in a manner special and unique to waterfront property.

77.

As a result of the Defendant Allied's widespread disposal of mercury and PCBs, the usefulness and enjoyment of docks by the Plaintiffs has been diminished.

78.

Commercial and recreational fishing, crabbing and shrimping have been prohibited by the Georgia DNR in the Turtle River, its tributaries and marshlands near the Plant Site, including Gibson

-17-

Creek, Purvis Creek and the Turtle River.

79.

The Plaintiffs' properties abut and are inundated by tidal waters in which commercial and recreational fishing, crabbing and shrimping have been prohibited or severely restricted.

80.

Animals, birds, aquatic life and vegetation living within the Turtle River Estuary and surrounding marshlands have been poisoned as a result of Defendant Allied's pollution.

81.

Mercury and PCBs wrongfully released by Defendant Allied have been ingested by fish, crabs and other wildlife.

82.

As a result of the wrongful acts of Defendant Allied, the crabs, fish and other wildlife that inhabit the Turtle River area and adjacent waters and marshes, including Morrison Slough, have dangerously high levels of mercury and PCBs.

83.

The fish and crabs in the area of the Turtle River and adjacent waters, including Morrison Slough, are unfit for human consumption as a result of Defendant Allied's contamination.

84.

Defendant Allied's illegal discharges have polluted Morrison Slough, the Turtle River, and adjacent waters and marshlands.

85.

Defendant Allied was advised by Monsanto in the late 1960's and early 1970's that it should take all steps necessary to prevent PCBs from entering any waterway because PCBs were bad for the

environment.

86.

Defendant Allied, at all times, knew that mercury and PCBs were harmful to the environment.

87.

Defendant Allied, at all times, knew that it should not allow its mercury and PCB waste to enter into any body of water, including Morrison Slough or the Turtle River.

88.

Defendant Allied had a duty to Plaintiffs to manage, store, protect and isolate its hazardous wastes in a reasonable manner.

89.

Defendant Allied had a duty to Plaintiffs to operate the Plant in a manner that did not pollute the waters and marshlands on and abutting Plaintiffs' properties.

90.

Defendant Allied had a duty to Plaintiffs to design and maintain all hazardous waste storage and disposal areas so that hazardous wastes did not seep into the marshlands and waters on and abutting Plaintiffs' properties.

91.

Defendant Allied's activities at the Plant Site caused and continue to cause toxic mercury and PCBs to be spilled, discharged and deposited into the Turtle River, its tributaries, surrounding marshlands and onto Plaintiffs' properties in amounts, concentrations and combinations that are harmful to the Plaintiffs' health, safety and welfare, and to animals, birds and aquatic life.

92.

Defendant Allied has stored, disposed, discharged and released its hazardous wastes onto Plaintiffs' properties and in the waters and marshlands abutting Plaintiffs' properties in order to avoid the costs of safe storage and safe disposal of its hazardous wastes.

93.

The above-described actions of Defendant Allied were in violation of the Georgia Water Quality Control Act as originally enacted in 1964, and formally codified as Georgia Code Ann. § 17-510. Such wrongful acts were in violation of former Georgia Code Ann. § 17-9901.

94.

The above-described actions of Defendant Allied constituted ongoing and numerous violations of the Amended Georgia Water Quality Control Act, O.C.G.A. §§ 12-5-29, 30. Such wrongful acts constitute repeated violations of the criminal prohibitions of the Act. O.C.G.A. § 12-5-53.

95.

Defendant Allied's dumping of mercury and PCBs into public waters was, at all times, illegal and criminal.

96.

The above-described activities of Defendant Allied were in violation of the Georgia Coastal Marshlands Protection Act of 1970, formerly codified as Georgia Code Ann. § 43-2401, et seq. Such wrongful acts violated the criminal prohibitions of the Act. Georgia Laws 1970, pp.939-948, and O.C.G.A. § 12-5-280, et seq.

97.

Having wrongfully and knowingly discharged toxic chemicals into the Turtle River and the

-20-

creeks, canals and marshes on and adjacent to Plaintiffs' properties, Defendant Allied is and has been under a duty to notify Plaintiffs and to warn them of the dangers that it has created.

98.

Defendant Allied has defined the boundaries of the site subject to remediation under the Comprehensive Environmental Response and Liability Act, 42 U.S.C. § 9601, et seq. The property within this site, as defined by Defendant Allied, is referred to as the Allied/LCP CERCLA Site.

99.

Property, waters and marshland outside the area of the Allied/LCP CERCLA Site are not part of a CERCLA superfund site.

100.

Defendant Allied has polluted land, water and marshland outside the boundaries of the Allied/LCP CERCLA Site.

101.

The Plaintiffs own property along Morrison Slough and adjoining marshland. As a result of the actions of Defendant Allied, the Plaintiffs' properties have been damaged and reduced in value.

102.

As a direct result of the Defendant Allied's wrongful actions, the Plaintiffs own property containing hazardous and toxic wastes that render the Plaintiffs potentially liable for the remediation of the waste on their property. The Defendant is liable for all such remediation costs and damages.

103.

The actions of the Defendant Allied have interfered with the use and enjoyment of the Plaintiffs' properties. The Turtle River, creeks and marshland adjoining and surrounding the Plaintiffs' properties have been poisoned and contaminated. The Plaintiffs face disruption of their

-21-

community, family and personal lives.

## COUNT I

## TRESPASS

### 104.

Paragraphs one through 103 of the Complaint are realleged and incorporated into Count I.

### 105.

The Defendant Allied's wrongful dumping of mercury and PCBs has resulted in tangible invasions upon the Plaintiffs' properties and constitutes a continuing trespass.

### 106.

As a result of the Defendant Allied's wrongful and continued trespasses, the Plaintiffs have suffered substantial loss of their right to the use and enjoyment of their properties and loss in the value of their properties.

### 107.

The Plaintiffs are entitled to recover from the Defendant Allied fair compensation for the loss of the use and enjoyment of their properties and for loss in the value of their properties.

### 108.

As a result of the Defendant Allied's actions, the Plaintiffs are entitled to nominal, special and general damages.

### 109.

The Defendant Allied has acted in bad faith, has been stubbornly litigious and has caused the Plaintiffs unnecessary trouble and expense. The Plaintiffs are entitled to recover reasonable attorney fees and expenses.

110.

The Plaintiffs are entitled to injunctive relief enjoining the continuing trespasses by the Defendant Allied to the extent the trespasses can be abated.

111.

The Defendant Allied's wrongful trespasses upon the properties of the Plaintiffs were done knowingly and continued knowingly in disregard of the rights of the Plaintiffs.

112.

Such knowing trespasses and wont of care by the Defendant Allied constitute aggravating circumstances that entitle the Plaintiffs to exemplary damages.

## COUNT II

### NUISANCE

113.

Paragraphs one through 103 of the Complaint are realleged and incorporated into Count II.

114.

The Defendant Allied's dumping of its mercury and PCBs into the Turtle River, tributaries of the Turtle River, and surrounding marshlands and uplands, onto Plaintiffs' properties, into fish and shellfish on and near Plaintiffs' properties, and onto and around Plaintiffs' docks, personally and improvements to real property is an unreasonable interference with the Plaintiffs' use and enjoyment of their properties and constitutes a continuing nuisance. The Defendant Allied's creation and maintenance of this nuisance has damaged the value of Plaintiffs' properties and restricted the usefulness and enjoyability of their properties.

115.

The Plaintiffs are entitled to recover from the Defendant fair compensation for the loss of the

use and enjoyment of their properties and for loss in the value of their properties.

116.

Defendant Allied acted knowingly in creating and maintaining a wrongful and continuing nuisance.

117.

As a result of the Defendant Allied's actions, Plaintiffs are entitled to nominal, special, and general damages.

118.

The Defendant Allied has acted in bad faith, has been stubbornly litigious and has caused the Plaintiffs unnecessary trouble and expense. The Plaintiffs are entitled to recover reasonable attorney fees and expenses.

119.

The Plaintiffs are entitled to injunctive relief enjoining the Defendant from continuing its nuisance to the extent the nuisance can be abated.

120.

The Plaintiffs are entitled to recover sufficient exemplary damages to punish Defendant Allied and to deter Defendant Allied from further like wrongful conduct.

**COUNT III**

**AIDING AND ABETTING**

121.

Paragraphs one through 103 of the Complaint are realleged and incorporated into Count III.

122.

Defendant Allied aided and abetted LCP in the evasion of environmental requirements at the

-24-

Plant and Plant Site between 1980 and 1994.

123.

Defendant Allied aided and abetted LCP in keeping the Plant in operation in order to avoid having to remove the mercury and PCBs that Defendant Allied had left behind at the Plant Site when it sold the Plant to LCP in 1979.

124.

The continued operation of the Plant resulted in additional discharges of mercury and PCBs into the Turtle River Estuary and adjoining waters and marshland and delayed remediation of the area and abatement of the nuisance and the trespasses caused by Defendant Allied.

125.

The delay in removal of the mercury and PCB contamination at and around the Plant Site increased discharges of mercury and PCBs into the Turtle River Estuary and adjoining waters and marshland and thus aggravated the nuisance and the trespasses caused by Defendant Allied.

126.

By its course of conduct, Defendant Allied has aided and abetted LCP in the operation of the Plant in a manner that increased discharges of mercury and PCBs into the Turtle River estuary and adjoining waters, marshland and upland.

127.

Defendant Allied's aiding and abetting of LCP's illegal operation of the Plant and of LCP's evasion of environmental laws were contributing causes of the damages and injuries set forth in this Complaint.

128.

Defendant Allied aided and abetted LCP and is thus liable to Plaintiffs for all damages,

-25-

including special and general damages caused by LCP.

129.

As a result of the Defendant Allied's actions, Plaintiffs are entitled to recover nominal, special, general and exemplary damages, together with reasonable attorney fees and expenses of litigation.

130.

The Plaintiffs are entitled to recover exemplary damages to punish Defendant Allied and to deter Defendant Allied from further like wrongful conduct.

**COUNT IV**

**CIVIL CONSPIRACY**

131.

Paragraphs one through 103 of the Complaint are realleged and incorporated into Count IV.

132.

The alliance between Defendant Allied, officials of Defendant Allied, officials of LCP and others to hide from government officials the presence and extent of wrongful storage and discharge of PCBs and mercury, and to continue and expand the nuisance and the trespasses of Defendant Allied was a civil conspiracy formed for wrongful purposes and conducted through wrongful actions.

133.

Through this civil conspiracy, Defendant Allied, its employees and agents, with LCP, its employees, agents and others kept the Brunswick chlor-alkalai plant in operation in order to avoid the legal responsibility to cleanup and remove chemicals wrongfully discharged and stored by Defendant Allied and thus continued and aggravated the nuisance and the trespasses of Defendant Allied.

-26-

134.

Through this conspiracy, Defendant Allied, along with LCP and others, hid and avoided disclosure of the nature and extent of its wrongful dumping of mercury and PCBs both on the Plant Site and discharged from the Plant Site.

135.

Through this conspiracy, Defendant Allied, with LCP and others, kept the chlor-alkalai plant in operation even though the Plant was being operated in violation of environmental laws.

136.

In the course of this conspiracy, Defendant Allied, with LCP and others, evaded compliance with environmental laws and regulations, continued the nuisances and trespasses and expanded the nuisances and trespasses.

137.

Defendant Allied is jointly liable for all acts and injuries caused in the course of this continuing conspiracy.

138.

The Plaintiffs are entitled to recover from Defendant Allied all damages including nominal, special and general damages suffered by the Plaintiffs that were caused by any party to this conspiracy.

139.

The Plaintiffs are entitled to recover from Defendant Allied their expenses of litigation, including reasonable attorney fees.

140.

The Plaintiffs are entitled to recover from Defendant Allied exemplary damages sufficient

-27-

to punish Defendant Allied and to deter Defendant Allied from further like wrongful conduct.

WHEREFORE, having stated their Complaint, Plaintiffs pray as follows:

a)  that process issue and the Defendant be served as provided by law;

b)  that the Plaintiffs recover from the Defendant all of their past, present and future general damages, special damages and nominal damages;

c)  that the Plaintiffs recover from the Defendant their expenses of litigation, including reasonable attorney fees;

d)  that the Plaintiffs have such injunctive relief to the extent possible as will abate the continuing nuisances and trespasses created and maintained by the Defendant;

e)  that the Plaintiffs recover from the Defendant exemplary damages sufficient to punish and deter the Defendant from further like wrongful conduct;

f)  that the Plaintiffs have trial by jury; and

g)  that the Plaintiffs have such other and further relief as the Court may deem just.

This 1st day of September, 2005.

Respectfully submitted,

BELL & JAMES

Pamela S. James
Georgia State Bar No. 389015
BELL & JAMES
Post Office Box 1547
Augusta, Georgia  30903-1547
(706) 722-2014

-28-

Robert P. Killian
Georgia State Bar No. 417575
KILLIAN & BOYD
506 Monk Street
Brunswick, Georgia  31520
(912) 265-5063

Joel O. Wooten
Georgia State Bar No. 776350
Greg Feagle
Georgia State Bar No. 256913
BUTLER, WOOTEN, FRYHOFER
 DAUGHTERY & CRAWFORD, LLP
Post Office Box 2766
Columbus, Georgia  31902
(706) 322-1990

ATTORNEYS FOR PLAINTIFFS